**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ _____ ) | |
| **RICO PERRY,** ) | |
| ) | |
| **Plaintiff,** ) | **CIVIL ACTION** |
| ) | |
| **v.** ) | **NO. 11-40004-TSH** |
| ) | |
| **THOMAS DICKHAUT, SUPERINTENDENT** ) | |
| **OF SOUZA BARANOWSKI CORRECTIONAL** ) | |
| **CENTER; ANTHONY MENDONSA, DEPUTY** ) | |
| **SUPERINTENDENT; TERRANCE J.** ) | |
| **FOUGERE, LIEUTENANT; ROBERT J.** ) | |
| **BLOOD, CAPTAIN; TWELVE JOHN DOE(s)** ) | |
| **SRT TEAM OFFICERS; LIEUTENANT** ) | |
| **MORAN; SERGEANT MATTHEWS; DANIEL** ) | |
| **R. LEMIEUX, LIEUTENANT; YVIN** ) | |
| **LEBLANC, SERGEANT; JOEL D.** ) | |
| **LAROCHELLA, CORRECTIONAL OFFICER;** ) | |
| **MICHAEL D. FARLEY, SERGEANT; SALLY** ) | |
| **MAYNARD, REGISTERED NURSE, ET AL.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**MEMORANDUM AND ORDER ON DEPARTMENT OF CORRECTIONS**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 111) AND**
**DEFENDANT SALLY MAYNARD'S MOTION FOR SUMMARY JUDGMENT**
**(Docket No. 114)**

**August 27, 2015**

**HILLMAN, D.J.**

This case arises out of attempts by Massachusetts Department of Corrections ("DOC")

staff at the Souza-Baranowski Correctional Center to "double bunk" inmate Rico Perry

("Plaintiff") with a cellmate in two different cells on March 18, 19, and 20, 2010. Plaintiff filed

this action against DOC Defendants Thomas Dickhaut, Anthony Mendonsa, Terrance Fougere,

Robert Blood, Yvin LeBlanc, Joel Larochelle, Michael Farley, and Nurse Sally Maynard,

1

asserting claims under 42 U.S.C. § 1983 for violations of his rights secured by the Eighth and Fourteenth Amendments of the U.S. Constitution.[1] The DOC Defendants and Nurse Maynard have each filed motions for summary judgment on the claims against them. (Docket Nos. 111 and 114). For the reasons set forth below, the motions are ***granted in part*** and ***denied in part***.

## Background

For purposes of these summary judgment motions, the facts of this case are recounted from the record in the light most favorable to the non-moving party. *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002). Plaintiff Rico Perry is incarcerated at the Souza-Baranowski Correctional Center ("SBCC"), a maximum-security correctional facility located in Shirley, Massachusetts. At all times relevant to the instant action, Thomas Dickhaut was the Superintendent of SBCC. Anthony Mendonsa was the Deputy Superintendent of Programs and Classification. The other DOC Defendants held the following positions: Terrance Fougere was a Lieutenant; Robert Blood was a Captain; Yvin LeBlanc and Michael Farley were Sergeants, and Joel Larochelle was a Correction Officer. Sally Maynard was a Registered Nurse working at SBCC, but employed by University of Massachusetts Correctional Health.

Until 2009, SBCC housed only one inmate per cell. *See* Dickhaut Aff., Docket No. 113-1, Ex. A, ¶ 24. Beginning in January of that year, as part of organizational changes within DOC facilities, maximum security inmates from MCI-Cedar Junction were transferred to SBCC. *Id.* As a result, some inmates were reassigned to double-bunked cells. *Id.* at ¶¶ 25-26. Upon notification of this change, inmates routinely advised correctional staff of their dissatisfaction with the prospective double-bunk policy. *Id.* at ¶ 25. As the transition to double bunking

---

[1] Originally named defendants Phillip Matthews, Michael Moran, Daniel Lemieux, and "12 John Doe(s) SRT Team Officers" have been dismissed from this action. (Docket Nos. 119, 122, 144).

occurred, inmates resisted in a number of ways, including by staging fights with cellmates, making false claims of enemy conflicts in order to remain in single-bunked cells,[2] and violating institutional rules for the purpose of being sent to the Special Management Unit (a unit that did not transition to double-bunked cells until after the rest of the facility). *Id.* at ¶ 26. In 2010, to remove the incentive for inmates to cause disruptions for the purpose of being placed in Special Management Unit singles, SBCC began to double bunk some of those cells. *See* Dickhaut Dep. (Cordero Litigation), Docket No. 127-1, Ex. F, at 146:16-148:20.

*DOC staff attempts to double bunk Plaintiff on March 18, 2010*

On March 18, 2010, Correction Officer Brian Boisse informed Plaintiff that he was assigned to be housed with another inmate in cell #30 in Special Management Unit J3. *See* Disciplinary Report, Docket No. 113-1, Ex. E. Upon learning of the assignment, Plaintiff refused, stating "I ain't living with anybody up in this place." *Id.* Captain Blood, the Shift Commander, was informed of Plaintiff's response. *See* Blood Aff., Docket No. 113-1, Ex. SS, ¶ 4. He relayed this information through the chain of command, and Superintendent Dickhaut authorized the use of force, including the use of chemical agent, to force Plaintiff to comply. *Id.* at ¶ 5. Around 5:00 pm that evening, Lieutenant Fougere went to the K-3 recreation deck, where Perry was being held in a cage pending his relocation to cell J3-30. *See* Fougere Aff., Docket No. 113-1, Ex. OO, ¶¶ 4-5. Under orders from Captain Blood, Fougere told Plaintiff that he was to be double bunked and instructed him to come to the door to be placed in restraints. *Id.* at ¶ 5.

---

[2] During the relevant period, DOC had in place a policy of identifying and documenting conflicts between inmates to secure the safety of inmates and staff. *See* Conflict Policy Document, Docket No. 113-1, Ex. LL. A "conflict" is defined as "a relationship or situation between inmates . . . which may likely result in placing them or other inmates or staff members in danger of harm or personal injury . . . ." *Id.* at 426.01. Inmates are screened and interviewed regarding conflicts upon entry into a facility, and encouraged to report perceived conflicts at any time during their incarceration. *See* Dickhaut Aff., ¶¶ 5-15; Mendonsa Aff., Docket No. 113-1, Ex. B, ¶¶ 6-13.

Plaintiff refused, saying "I'm not double bunking with anyone." *Id.* at ¶ 6. Fougere told Plaintiff that SBCC Administration had authorized the use of force if he continued to refuse. *Id.*

DOC staff videotaped the subsequent attempts to double bunk Plaintiff. *See* SBCC DVD Disk 102, Docket No. 116, Ex. 3. Following Plaintiff's initial refusal, Captain Blood asked Nurse Sally Maynard to determine whether Plaintiff was inebriated. *See* SBCC DVD Disk 102, at 00:06-40. Maynard was escorted to the recreation deck where Plaintiff was located; she told Plaintiff that SBCC staff wanted him to comply with the rules and be double bunked. *Id.* at 00:41-01:45. Plaintiff did not acknowledge or respond to Maynard. *Id.* Maynard reported to Captain Blood that based on her assessment, Plaintiff was not inebriated. *Id.* at 02:00. Captain Blood next requested mental health professional Jen Geary to assess Plaintiff and inform him that Superintendent Dickhaut had authorized the use of force and chemical agent to relocate Plaintiff to J3-30. *Id.* at 02:20-55. Geary did so, and Plaintiff responded by stating that he needed time by himself. *Id.* at 03:00-04:10. As a result of Plaintiff's continued refusal, Captain Blood authorized an "Extraction Team"—a team of seven DOC employees from the Special Operations Division—to use force and chemical agent to relocate Plaintiff. *Id.* at 04:55-05:55. Blood informed the team that the only chemical agent they were to use was oleoresin capsicum, or "OC" (pepper spray).[3] *Id.* The Extraction Team was led by Lieutenant Daniel Lemieux. None of the remaining defendants were part of the March 18 Extraction Team. *See* Use of Force Report, Docket No. 113-1, Ex. J.

The Extraction Team arrived at the K3 recreation deck around 5:35 pm. *Id.* at 07:35. They brought Plaintiff out of the unit without incident, and escorted him to J3-30. *Id.* at 07:35-15:00. Before arriving at the cell, Plaintiff informed Nurse Maynard that his only medical issue

---

[3] Noting that Plaintiff had asthma, Dr. Patricia Ruze had approved the use of "OC only" early that afternoon. *See* Use of Chemical Agents Checklist, Docket No. 113-1, Ex. L.

was that he "need[ed] time alone." *Id.* at 14:20. Plaintiff entered J3-30 at 5:43 pm. *Id.* at 15:50. Upon entering the cell, both Plaintiff and cellmate Robert Williams voluntarily had their restraints removed. *Id.* at 15:55-18:00. Once the restraints were off, the cellmates immediately began pushing, grabbing, and punching each other in the head. *Id.* at 18:03. Lemieux ordered the inmates to stop, but they continued to fight. *Id.* at 18:12. Consequently, Lemieux dispensed one burst of OC into the cell. *Id.* at 18:53. The spray caused Plaintiff and Williams to cease fighting and back up to the door so that wrist restraints could be applied. *Id.* at 19:00-20:45.

The Extraction Team removed Plaintiff and Williams without incident, and escorted them to a common area to be examined by medical personnel. *Id.* at 20:50-25:10. Nurse Maynard washed Plaintiff's eyes out and asked whether he had any injuries. *Id.* at 24:45. Plaintiff stated he had asthma, but did not appear out of breath. *Id.* at 24:50. Nurse Maynard did not ask any follow-up questions. *Id.* Plaintiff and Williams were cleared to return and escorted to the showers to decontaminate. *Id.* at 25:10. Williams remarked "hope y'all ain't planning on putting us back in the same cell again; it's going to be the same shit over and over." *Id.* at 25:53. After showering, Williams was placed alone in J3-30, and Plaintiff was placed alone in J3-15. *Id.* at 35:00; 37:15. Plaintiff had not identified Robert Williams as an enemy, nor had DOC staff identified a conflict between the two inmates prior to Plaintiff's placement in J3-30. *See* Dickhaut Aff., ¶¶ 37-39; Mendonsa Aff., ¶ 20; Inmate Conflicts Report for Rico Perry, Docket No. 113-1, Ex. UU.

Defendant Larochelle did not work at SBCC on Thursday, March 18, 2010. *See* Larochelle Aff., Docket No. 113-1, Ex. QQ, ¶ 3. Defendants Farley and LeBlanc worked in other sectors of the facility on March 18, and did not have contact with Plaintiff. *See* Farley Aff., Docket No. 113-1, Ex. RR, ¶ 3; LeBlanc Aff., Docket No. 113-1, Ex. D, ¶ 3.

*DOC staff attempts to double bunk Plaintiff on March 19-20, 2010*

The following day, DOC staff assigned Plaintiff to double bunk with inmate Peter Fanfan in Unit K3, cell #5. The attempts to double bunk Plaintiff and Fanfan were also recorded on video. *See* SBCC DVD Disk 104, Docket No. 116, Ex. 5. Captain Robert Gould instructed mental health clinician Valerie Etter to inform each inmate of the assignment. *Id.* at 00:15. At 4:15 pm, Etter went to J3-15 and asked Plaintiff if he was willing to be "cuffed up." *Id.* at 01:45. Plaintiff stated that he needed a single cell because he wanted to be by himself and needed time alone. *Id.* at 01:55. Etter informed Plaintiff that Dickhaut had authorized the use of force and chemical agent if he did not comply with the double-bunk assignment. *Id.* at 03:03. Plaintiff responded "I will cuff up and go wherever you want but I'm not living with nobody . . . the same thing's gonna happen as yesterday . . . we'll go at it again all day." *Id.* at 03:07. Etter next visited inmate Fanfan and asked whether he was willing to be cuffed in order to receive a cellmate in K3-05. *Id.* at 04:20. Fanfan responded that he was willing to be double bunked with someone that he knew, but that "if y'all trying to force me to be with someone I do not know, and that I do not want to be with, I can't tell you what's gonna happen." *Id.* at 04:30. Etter informed Captain Gould that Plaintiff and Fanfan were refusing to be double bunked. *Id.* at 05:35.

Gould then advised Lieutenant Robert Hayes to prepare an Extraction Team for a planned use of force and chemical agent to double bunk Plaintiff and Fanfan. *Id.* at 06:30-07:35. Gould informed Hayes that Plaintiff had assaulted another inmate the day before during a double-bunk attempt. *Id.* at 07:36. Gould further instructed that if an altercation occurred, force could be used to stop the fight, and that the inmates should be removed, assessed by medical personnel, and placed back in K3-05 with restraints on. *Id.* at 07:53. None of the named Defendants were members of the March 19 Extraction Team. *See* Use of Force Report, Docket No. 113-1, Ex. J.

The Extraction Team entered Unit J3 at 5:06 pm, and Plaintiff complied with the order to be placed in restraints. *See* SBCC DVD Disk 104, at 09:30. Plaintiff was removed from J3-15, escorted to a common area, strip-searched, seen by medical staff, and placed in a holding cell. *Id.* at 09:45-18:10. The officers placed Plaintiff in K3-05 with Fanfan at 5:25 pm. *Id.* at 22:35-23:05. Once the door was closed, they removed the inmates' restraints. *Id.* at 23:10-27:45. As soon as the restraints were off, Plaintiff and Fanfan began fighting. *Id.* at 27:47. Lieutenant Hayes ordered them to stop, but they continued to fight. *Id.* at 27:53. Hayes dispensed two bursts of OC into the cell and instructed the inmates to "cuff up." *Id.* at 27:57-28:17. The inmates complied; as the restraints were being applied, Plaintiff repeatedly complained about his asthma. *Id.* at 28:55-29:15. Plaintiff and Fanfan were escorted to the common area, assessed by Nurse Sally Colley, and taken to the showers to decontaminate. *Id.* at 32:25-49:00. At 5:52 pm, both inmates were placed back in K3-05 with restraints left on. *Id.* at 50:00. Plaintiff had not identified Fanfan as an enemy, nor had DOC staff identified a conflict between the two inmates prior to Plaintiff's placement in K3-05. *See* Dickhaut Aff., ¶¶ 37-39; Mendonsa Aff., ¶ 20; Inmate Conflicts Report for Rico Perry, Docket No. 113-1, Ex. UU.

The Extraction Team returned with Nurse Colley at 7:46 pm to check on the inmates. *See* SBCC DVD Disk 104, at 50:40.  The officers adjusted the restraints and removed the inmates from the cell. *Id.* at 51:00. Plaintiff complained of his asthma and asked for his asthma pump. *Id.* at 54:20. Colley checked Plaintiff's restraints and concluded he had good circulation and no adjustments were necessary. *Id.* at 54:40. Colley went to retrieve the asthma pump, but upon return informed Plaintiff that the pump must have been discontinued because she did not have a medication administration record for him. *Id.* at 1:00:15. At 8:00 pm, both inmates were placed back in K3-05 with restraints left on. *Id.* at 1:03:50.

At 8:47 pm, Captain Gould advised Lieutenant Hayes that the inmates had altered or destroyed their restraints. *Id.* at 1:04:30. The Extraction Team placed new restraints on both inmates and removed them from the cell. *Id.* at 1:06:00-13:00. Colley approved the new restraints, despite Plaintiff's complaint that the wrist cuffs were too tight. *Id.* at 1:21:04. Plaintiff and Fanfan were placed back in K3-05 at 9:25 pm. *Id.* at 1:21:45. At some point thereafter the inmates broke the restraints again; the Extraction Team returned at 10:35 pm and placed the inmates in new restraints. *Id.* at 1:22:00. Plaintiff's restraints were approved by medical staff. *Id.* at 1:27:50. Plaintiff complained of gashes on his wrists, but Colley concluded that there were only superficial scratches. *Id.* at 1:29:28-30:00.

At 11:00 pm, SBCC staff took over for the Extraction Team. Defendant Joel Larochelle was assigned to a "constant watch" over K3-05—a type of security watch in which an officer is stationed in front of a cell to continuously observe the inmates. *See* Larochelle Aff., ¶¶ 4-6. A third video documents the use of force by SBCC staff to double bunk Plaintiff during the early morning hours of March 20, 2010.[4] *See* SBCC DVD Disk Restraint Checks 86-10, Docket No. 116, Ex. 7. Just before 1:00 am, the inmates were separated from their cells and Nurse Maynard performed a restraint check on Plaintiff, finding no red marks or open areas on wrists or ankles and a full range of motion. *Id.* at 01:35-02:45. When Fanfan was brought back to K3-05, Plaintiff again expressed his refusal to double bunk, stating "I don't want no cellie." *Id.* at 03:48.

Shortly thereafter Plaintiff broke his restraints, and at approximately 1:10 am, Larochelle witnessed Plaintiff start throwing closed fist punches to Fanfan's torso. *See* Larochelle Aff., ¶ 7. An emergency response was initiated and Plaintiff complied with orders to cease fighting. *Id.* at

---

[4] Unlike the first two videos recorded by the Extraction Teams, the video entitled "SBCC DVD Disk Restraint Checks 86-10" appears to have an incorrect time stamp. For the timeline of the early morning hours of March 20, the Court relies on the affidavits, incident reports, and the oral statements by SBCC staff in the video.

¶ 8. Defendant Yvin LeBlanc and Correction Officer Brandin Roberts escorted Plaintiff to a "strip cell" (a cell where inmates are temporarily held for strip searches). Prior to being placed in the strip cell, Plaintiff was assessed by Nurse Colley. *See* SBCC DVD Disk Restraint Checks 86-10, at 07:50-09:00. Colley did not notice any injuries on Plaintiff at the time, although he complained of having "scrapes and scratches and bruises all over" his body. *Id.* at 08:53.

At some point around 2:00 am, correction officers attempted to move Plaintiff from the strip cell back to K3-05. Plaintiff refused, creating "dead weight" and passively evading attempts to escort him back to the cell. *Id.* at 12:57. Lying on the floor of the strip cell, Plaintiff stated "spray me, do what you gotta do . . . I ain't goin in there." *Id.* at 13:40. Sergeant Farley spontaneously applied two bursts of OC to Plaintiff's face. *Id.* at 13:44. Plaintiff was left in the strip cell for a few minutes, then Sergeant Farley ordered Plaintiff to come to the cell door to be restrained and taken to K3-05. *Id.* at 16:09. Plaintiff again refused, demanding that he be left in a cell alone. *Id.* at 16:17. Farley dispensed two more bursts of OC into the strip cell and ordered Plaintiff to come to the door to be cuffed. *Id.* at 16:40-18:00. Due to the effect of the OC, Plaintiff complied. *Id.* However, once restraints were applied, Plaintiff fell to the ground. *Id.* at 19:45. SBCC staff pulled Plaintiff out of the strip cell, but he was unresponsive. Nurse Colley assessed Plaintiff, washed out his eyes, and observed that Plaintiff's breathing was fine. *Id.* at 20:00-26:34. Correction officers escorted Plaintiff back to K3-05 on a gurney and carried him into the cell with Fanfan. *Id.* at 22:50-28:30.

Around 2:50 am, Plaintiff again broke his restraints, and began throwing punches and elbows at Fanfan. *Id.* at 28:35; *see also* Larochelle Aff., ¶ 12. SBCC staff removed Plaintiff from the cell and applied new restraints. *See* SBCC DVD Disk Restraint Checks 86-10, at 29:35-33:00. Nurse Colley examined the restraints and asked the officers to loosen one of the wrist

cuffs. *Id.* at 33:10. As the correction officers attempted to do so, Plaintiff refused to let go of one of the broken cuffs that was still attached to his wrist. *Id.* The officers forced Plaintiff against the wall as they tried to remove the broken cuff from his hand. *Id.* at 33:25. Plaintiff continued to physically resist their attempts to take the cuff, despite repeated orders to "let go of it." *Id.* With three officers holding Plaintiff to the wall, one was able to pry the broken cuff from Plaintiff's hand, and Plaintiff stopped resisting. *Id.* at 33:42. Several seconds later, while Plaintiff was subdued and still pinned to the wall, Sergeant Farley walked up and sprayed OC in Plaintiff's face. *Id.* at 33:49. Plaintiff pulled away from the spray and hung his head while officers held him securely by the shoulders and arms. *Id.* at 33:57. With Plaintiff's head hanging down, Farley reached underneath and sprayed OC up into Plaintiff's face. *Id.* at 33:57. The correction officers carried Plaintiff into the cell and left him on the floor. *Id.* at 34:10. Sergeant Farley asked whether Plaintiff wanted to have his eyes washed out, but Plaintiff refused. *Id.* at 35:10.

At 5:00 am, Nurse Colley offered to check the restraints on Plaintiff and Fanfan, but both inmates refused. *Id.* at 35:19. At 6:55 am, Sergeant Farley asked whether the inmates were ready to comply with the rules of the institution. *Id.* at 37:20. Plaintiff and Fanfan responded affirmatively. *Id.* at 37:20-25. SBCC staff removed the restraints on both inmates, and they remained in the cell without further incident. *Id.* at 38:00-41:45.

There is no evidence that Defendants Blood or Fougere had any contact with Plaintiff on March 19 or March 20, 2010. The only named parties that had contact with Plaintiff on those dates were Larochelle, LeBlanc, and Farley. Neither Larochelle nor LeBlanc administered OC; their contact with Plaintiff was limited to securing and escorting Plaintiff between cells. *See* Larochelle Aff., ¶¶ 10-18; LeBlanc Aff., ¶¶ 6-20.

## Discussion

### *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 provides that a district court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1968).  It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute.  *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex*, 477 U.S. at 325).  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002). However, the court should not "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007).

*Analysis*

Plaintiff brings suit against Defendants under 42 U.S.C. § 1983, asserting that Defendants abridged his Eighth Amendment right to be free from cruel and unusual punishment in three ways: (1) Defendants Fougere, Blood, LeBlanc, Larochelle and Farley failed to protect Plaintiff by placing him in cells with violent inmates, and used excessive force in their attempts to double bunk him; (2) Defendants Dickhaut and Mendonsa are subject to supervisory liability based on the policy of double bunking inmates; and (3) Defendant Sally Maynard failed to provide adequate treatment for Plaintiff's serious medical needs.[5]

*(1) Claims against Fougere, Blood, LeBlanc, Larochelle, and Farley*

(A) Failure to protect claims

Defendants Blood and Fougere were peripherally involved in attempts to double bunk Plaintiff in J3-30 on March 18, *see* Blood Aff., ¶¶ 1-9; Fougere Aff., ¶¶ 4-11, and Defendants Larochelle, LeBlanc, and Farley participated in attempts to double bunk Plaintiff in K3-05 on the night of March 19-20. *See* Larochelle Aff., ¶¶ 10-18; LeBlanc Aff., ¶¶ 6-20; Farley Aff., ¶¶ 3-24. Although not named specifically in this claim, Defendant Dickhaut authorized the use of force and chemical agent to double bunk Plaintiff. *See* Dickhaut Aff., ¶ 30. Regardless of each Defendant's precise contributions to the events of this lawsuit, however, none are liable on the failure to protect claims.

---

[5] Plaintiff seeks compensatory and punitive damages, and asserts claims against Defendants in both their individual and official capacities. *See* Pl.'s Compl., Docket No. 1. Sovereign immunity prohibits damages liability to the extent that Defendants have been sued in their official capacities, because the party in interest in an official-capacity suit is the state government entity, not the named official. *See Edelman v. Jordan*, 415 U.S. 651, 677, 94 S. Ct. 1347 (1974); *Hafer v. Melo*, 502 U.S. 21, 25 112 S. Ct. 358 (1991). Because the DOC and UMass Correctional Health are state agencies, and because Plaintiff does not seek any prospective injunctive relief, the Court evaluates the claims against Defendants in their individual capacities only. *See Wilson v. Brown*, 889 F.2d 1195, 1197 (1st Cir. 1989) (dismissing § 1983 damages suit brought against warden of state prison agency in his official capacity).

To establish a violation of the Eighth Amendment, a prisoner must meet two requirements. First, "the alleged deprivation of adequate conditions must be objectively serious, i.e., 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Giroux v. Somerset County*, 178 F.3d 28, 32 (1st Cir. 1999) (quoting *Farmer*, 511 U.S. at 834). Second, "the official involved must have had a sufficiently culpable state of mind, described as deliberate indifference to inmate health or safety." *Id.* (internal quotations and citations omitted). To be sure, prison officials have "a responsibility not to be deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners." *Burrell v. Hampshire County*, 307 F.3d 1, 7 (1st Cir. 2002) (citing *Farmer*, 511 U.S. at 833). "However, not every injury suffered by a prisoner at the hands of a fellow inmate gives rise to an Eighth Amendment claim." *Giroux*, 178 F.3d at 32. Prison officials "cannot be deliberately indifferent [under the Eighth Amendment] if they respond[] reasonably to the risk" of violence by other inmates. *Burrell*, 307 F.3d at 8. The inquiry into the reasonableness of Defendants' conduct must "incorporate[] due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* (internal quotations omitted). Thus, whether the DOC Defendants violated Plaintiff's rights by failing to protect him must be examined within the context of what they knew on March 18, 19, and 20, 2010.

Plaintiff argues that the DOC Defendants acted with deliberate indifference to a risk of serious harm by repeatedly placing him in a cell with a "known enemy." Contrary to Plaintiff's contention, however, there is no evidence that DOC staff knew or should have known that either Williams or Fanfan were Plaintiff's enemies prior to placing them in the same cell. Neither Plaintiff nor DOC staff ever identified the cellmates as conflicts under the DOC conflict policy. *See* Dickhaut Aff., ¶¶ 37-39; Mendonsa Aff., ¶ 20; Inmate Conflicts Report for Rico Perry,

Docket No. 113-1, Ex. UU. The record consistently demonstrates that Plaintiff was refusing to

bunk with *anyone*, not just Williams and Fanfan. *See, e.g.*, Disciplinary Report, Docket No. 113-

1, Ex. E (Plaintiff stating "I ain't livin' with anybody up in this place"); SBCC DVD Disk 104,

Docket No. 116, Ex. 5, at 3:07 (Plaintiff stating "I'm not living with nobody"); SBCC DVD Disk

Restraint Checks 86-10, at 16:38 (Plaintiff stating that he was not trying to hurt anyone, and that

he just wanted to be left alone in a cell by himself).[6] This evidence aligns with the DOC

Defendants' assertion that inmates across the facility were staging fights merely for the purpose

of thwarting the double-bunk policy. *See, e.g.*, Dickhaut Aff., ¶¶ 25-26.

  These facts provided an objective basis for the DOC Defendants to reasonably believe

that they were not exposing Plaintiff to a legitimate risk of serious harm by double bunking him,

even though Plaintiff would get into fights with his cellmates. Moreover, making an exception to

the double-bunk system for one inmate simply because he is purposefully disruptive would pose

substantial risks for the overall management of a correctional institution. *See Stenzel v. Ellis*, 916

F.2d 423, 428 (8th Cir. 1990) ("To allow prisoners to choose which jailhouse rules they will

obey would result in chaos. . . . There is nothing inhumane or wanton about enforcing reasonable

prison regulations without exception, even for those prisoners who believe they know better than

the jailers."). Thus, repeatedly placing Plaintiff in his assigned double-bunked cell was a

reasonable response to the perceived attempts of Plaintiff to manipulate his housing placement.

  The reasonableness of double bunking Plaintiff despite his protests is further supported

by the manner in which it was executed. DOC staff informed Plaintiff on multiple occasions that

---

[6] Fanfan has filed an affidavit supporting the argument that he and Perry were "known enemies" at the time they were placed in the same cell. *See* Fanfan Aff., Docket No. 131, at 46, ¶ 2. This bald assertion is insufficient to create a genuine issue of fact, however, because it is plainly belied by the video evidence (including Fanfan's own recorded statements) and Plaintiff's inmate conflicts report. *See Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994) (observing that a genuine issue of fact requires "that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party" (internal quotations omitted)).

Dickhaut had authorized the use of force and chemical agent if he would not comply. *See* Fougere Aff., ¶ 6; SBCC DVD Disk 104, at 3:03. When the Extraction Teams relocated Plaintiff to the double-bunked cells, they did not simply leave him inside to fend for himself. The officers purposefully and continuously monitored Plaintiff and his cellmates. When a fight began, they immediately administered OC to stop it. *See, e.g.*, SBCC DVD Disk 102, at 18:03. When Plaintiff was placed in a cell with restraints on, DOC staff and medical personnel consistently checked on them, adjusted the restraints when necessary, and assessed his medical needs. *See, e.g.*, SBCC DVD Disk 104, at 50:40-1:00:15. Officer Larochelle was assigned a "constant watch" over K3-05 to monitor Plaintiff and his cellmate. *See* Larochelle Aff., ¶¶ 4-6. These were all reasonable steps taken to *ensure* Plaintiff's safety, not acts of deliberate indifference. Thus, even viewed in the light most favorable to Plaintiff, the DOC Defendants' "behavior was not unreasonable when considered within the context of what they knew." *Burrell*, 307 F.3d at 8. The Court will grant summary judgment on the failure to protect claims.

(B) <u>Excessive force claims</u>

The Eighth Amendment prohibits the use of excessive and unjustified physical force by prison officials against inmates. *See Whitley v. Albers*, 475 U.S. 312, 327, 106 S. Ct. 1078 (1986). But it is "only the unnecessary and wanton infliction of pain [that] constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* at 319, 106 S. Ct. 1078 (internal quotations omitted). The salient question is "whether the force was applied 'maliciously and sadistically for the very purpose of causing harm,' rather than 'in a good-faith effort to maintain or restore discipline.'" *Skinner v. Cunningham*, 430 F.3d 483, 488 (1st Cir. 2005) (quoting *Whitley*, 475 U.S. at 320-21, 106 S. Ct. 1078 and *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S. Ct. 995 (1992)). Factors such as "the need for application of force, the relationship between that

need and the amount of force used, the threat reasonably perceived by the responsible officials,

and any efforts made to temper the severity of a forceful response" are relevant in determining

whether a prison official used excessive force. *Hudson*, 503 U.S. at 7, 112 S. Ct. 995.

The record demonstrates that the only named defendants who had physical contact with

Plaintiff during the events of March 18-20 were Larochelle, LeBlanc, and Farley. Of those

defendants, the video recording and affidavits show that Larochelle and LeBlanc were only

involved in escorting Plaintiff between cells in the early morning hours of March 20. *See* SBCC

DVD Disk Restraint Checks 86-10; LeBlanc Aff., ¶¶ 6-20; Larochelle Aff., ¶¶ 4-20. At no point

did they kick, punch, assault, or take any other action toward Plaintiff that could be considered

"the unnecessary and wanton infliction of pain." *See id.* Therefore, there is no genuine issue of

material fact that would preclude summary judgment on the excessive force claims against

Fougere, Blood, Larochelle, and LeBlanc.[7]

The same is not true for Defendant Farley. Viewed in the light most favorable to Plaintiff,

there is a genuine issue of material fact as to whether Farley used excessive force. The video

evidence shows that during the early morning hours of March 20, Farley sprayed Plaintiff with

OC six times. *See* SBCC DVD Disk Restraint Checks 86-10, at 13:44, 16:38, 33:49. The first

four sprays occurred shortly after 2:00 am, when SBCC staff were attempting to move Plaintiff

from the strip cell back to K3-05. It is true that Plaintiff was refusing to comply with the order to

return to the cell because he did not want to be double bunked. However, unlike the occasions

when the Extraction Team used OC to stop fights, Farley sprayed Plaintiff when he was safe and

---

[7] For the same reason that the Fanfan affidavit fails to create a genuine dispute on the question of whether
Plaintiff was housed with a known enemy, Fanfan's assertion that unnamed prison staff "viciously assaulted"
Plaintiff by kicking and punching him is insufficient to support the excessive force claims against Fougere, Blood,
LeBlanc and Larochelle. *See* Fanfan Aff., ¶ 11. In light of the comprehensive video recordings of Plaintiff's cell
extractions, no reasonable juror could credit such evidence. *See Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st
Cir. 1994). In any event, Plaintiff seems to have abandoned the physical assault claim, stating that "the main
contention of excessive force . . . is based on the chemical agent." *See* Pl.'s Mem. in Opp., Docket No. 127, at 19.

alone in his cell. After the fourth burst of OC, Plaintiff fell to the floor and remained

unresponsive for several minutes while the staff took him back to K3-05 on a gurney.

Farley's fifth and sixth sprays of OC cause greater concern. Defendant Farley's incident

report and affidavit suggest that he administered OC *while* Plaintiff was actively resisting the

attempts of SBCC staff to remove a broken restraint from his hand. *See* Incident Report, Docket

No. 113-1, Ex. DD; Farley Aff., ¶ 18. But the video shows that officers were able to pry the cuff

away *before* Farley sprayed OC. *See* SBCC DVD Disk Restraint Checks 86-10, at 33:42. In fact,

Plaintiff seemed to have stopped resisting for a full seven seconds before Farley walked up and

sprayed Plaintiff in the face. *Id.* at 33:49. At that point, Plaintiff instinctively pulled away, hung

his head, and did not appear to resist as multiple officers continued to secure him. Farley then

reached down below Plaintiff's head and sprayed OC up into his face again. *Id.* at 33:57. This

evidence creates a genuine dispute regarding material facts. A reasonable juror could conclude

that such use of OC on a defenseless and non-resistant inmate was non-*de minimis* force "applied

'maliciously and sadistically for the very purpose of causing harm,' rather than 'in a good-faith

effort to maintain or restore discipline.'" *Skinner*, 430 F.3d at 488 (internal citations omitted).

The fact that Plaintiff has not offered evidence of an enduring injury caused by the OC is

not relevant. The Supreme Court has "rejected the notion that 'significant injury' is a threshold

requirement" for an Eighth Amendment excessive force claim. *Wilkins v. Gaddy*, 559 U.S. 34, 37

130 S. Ct. 1175 (2010). Furthermore, because Plaintiff seeks punitive damages, his claims are

not barred by the physical injury requirement of 42 U.S.C. § 1997e(e).[8] Consequently, viewing

---

[8] 42 U.S.C. § 1997e(e) bars prisoners from recovering compensatory damages for mental or emotional injuries without showing physical injury. *See* 42 U.S.C. § 1997e(e). The First Circuit has not determined whether the provision applies to constitutional claims. *See Kuperman v. Wrenn*, 645 F.3d 69, 73 n.5 (1st Cir. 2011). But even if it does, § 1997e(e) is not dispositive because Plaintiff also seeks punitive damages. *See id.*

the record in the light most favorable to Plaintiff, genuine issues of material fact exist regarding

the excessive force claim against Defendant Farley.

(C) <u>Qualified Immunity</u>

The DOC Defendants further argue that, assuming a reasonable juror could find an

Eighth Amendment violation, they are entitled to qualified immunity. Accordingly, the Court

must examine whether Farley is shielded by qualified immunity on the excessive force claim.

Qualified immunity protects government officials "from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727

(1982). The doctrine provides public officials "breathing room to make reasonable but mistaken

judgments about open legal questions." *Ashcroft v. Al-Kidd*, --- U.S. ---, 131 S. Ct. 2074, 2085

(2011). However, "qualified immunity does not shield public officials who, from an objective

standpoint, should have known that their conduct was unlawful." *Haley v. City of Boston*, 657

F.3d 39, 47 (1st Cir. 2011) (internal quotations omitted).

Courts use a two-part test to determine whether qualified immunity applies: (1) whether

the facts alleged by the plaintiff make out a violation of a constitutional right; and, if so (2)

whether the right was clearly established at the time of the alleged violation. *See MacDonald v.*

*Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014). For the reasons described above, genuine

issues of fact exist that are material to Plaintiff's excessive force claim against Farley. Therefore,

to overcome qualified immunity, Plaintiff's rights must have been "clearly established" at the

time of the violation. This analysis involves two questions: first, whether the legal contours of

the constitutional right were sufficiently clear; and second, whether in the specific factual context

of the case, the violation would have been clear to a reasonable official. *Id.* at 12. "The salient

question is whether the state of the law at the time gave a defendant 'clear notice that what he was doing was unconstitutional.'" *Diaz-Bigio v. Santini*, 652 F.3d 45, 50 (1st Cir. 2011).

The Court finds that Defendant Farley is not entitled to qualified immunity. It was clearly established in 2010 that a prison official may not inflict "unnecessary and wanton pain and suffering" by using force against an inmate "maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6, 112 S. Ct. 995. To be clear, a factfinder may conclude that Farley only dispensed OC in a good faith effort to restore discipline. But the excessive force claim hinges on a factual question about Farley's state of mind. That question is the province of the jury. *See Morelli v. Webster*, 552 F.3d 12, 18-19 (1st Cir. 2009) (describing how district courts should apply qualified immunity standard at summary judgment stage). Given the circumstances surrounding Farley's use of OC—especially the timing of the fifth and sixth sprays—a reasonable juror could conclude that Farley was fed up with Plaintiff for being disruptive, and purposefully retaliated by spraying Plaintiff in the face after he had stopped resisting. Any reasonable prison official would have understood that such a malicious infliction of unnecessary pain—even if did not result in enduring injury—would violate a prisoner's constitutional rights. Therefore, Defendant Farley is not entitled to qualified immunity on the excessive force claim.

For the reasons stated above, the Court will deny the motion for summary judgment on the excessive force claim as it applies to Defendant Farley. The motion will be granted on the excessive force claim as it applies to all other DOC Defendants.

*(2) Supervisory liability claim against Dickhaut and Mendonsa*

Plaintiff asserts a claim of supervisory liability against Defendants Dickhaut and Mendonsa based on the double-bunk policy at SBCC. Specifically, Plaintiff claims that Dickhaut and Mendonsa unconstitutionally instituted a policy of using force and restraints to double bunk inmates even after they fought each other. A supervisor may be liable under § 1983 "when their own action or inaction, including a failure to supervise that amounts to gross negligence or deliberate indifference, is a proximate cause of the constitutional violation." *Guzman v. City of Cranston*, 812 F.2d 24, 26 (1st Cir. 1987). One way to establish supervisory liability is to demonstrate that the supervisor formulated a policy or engaged in a custom that led to a constitutional violation. *See Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). However, "isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference." *Id.* Furthermore, courts have concluded that double bunking a prison cell is not a *per se* constitutional violation, but may be unlawful in rare cases if combined with other adverse conditions. *See Cote v. Murphy*, 152 Fed. App'x 6, 2005 WL 2708221 (1st Cir. 2005).

The Court will grant summary judgment on the supervisory liability claim. As explained above, the attempts by the DOC Defendants to double bunk Plaintiff in this case did not amount to a constitutional violation. Because there is no underlying conduct that was "itself violative of a plaintiff's constitutional rights," the assertion that the supervisors are also liable fails. *See Maldonado-Denis*, 23 F.3d at 582 (noting that a plaintiff must "connect the supervisor's conduct to *the subordinate's violative act*") (emphasis added). Even if, however, Plaintiff's Eighth Amendment rights had been violated when he was placed in a double-bunked cell, the policy simply does not constitute deliberate indifference to the rights of prisoners. This precise claim

was raised last year by a different inmate at SBCC. *See Cordero v. Dickhaut*, No. 11-cv-10098-FDS, 2014 WL 6750064 (D. Mass. 2014). In that case, Judge Saylor granted summary judgment in favor of Defendants Dickhaut and Mendonsa, finding that "SBCC staff considered the violent tendencies and mental health needs of inmates" before implementing the policy, and therefore the policy did not amount to deliberate indifference of prisoners' Eighth Amendment rights. *See id.* at *9; *see also* Report and Recommendation of Magistrate Judge Boal, No. 11-cv-40098-FDS, 2014 WL 6750062 (D. Mass. 2014) (adopted by Judge Saylor).

The Court declines to depart from the analyses of Judge Saylor, Magistrate Judge Boal, and the others who have examined the use of double-bunked cells at SBCC.[9] "The issue is not . . . whether the policy is wise or sensible, or whether this Court might adopt something different. It is whether the policy, under the circumstances, amounted to deliberate indifference." *Cordero*, 2014 WL 6750064, at *9. Plaintiff does not offer evidence of widespread constitutional violations to support a finding of deliberate indifference. To the contrary, the evidence shows that Dickhaut and Mendonsa implemented the double-bunk policy with thought and care for the safety of all constituents of SBCC. *See, e.g.*, Dickhaut Aff., ¶¶ 34-37; Mendonsa Aff., ¶¶ 17-20. Nor does Plaintiff point to additional conditions of confinement that, when combined with double bunking, make the policy is unconstitutional. Consequently, Plaintiff fails to show that Dickhaut and Mendonsa are subject to supervisory liability for the double-bunk policy at SBCC. Because there is no genuine issue of material fact on Plaintiff's supervisory liability claim, the Court will grant summary judgment in favor of Defendants Dickhaut and Mendonsa.

---

[9] Similar claims regarding double-bunked cells at SBCC have been litigated before other judges in this District, and all have rejected the argument that the policy is unconstitutional. *See, e.g.*, *Scott v. Dickhaut*, No. 10-cv-11348-GAO, 2013 WL 4017822, at *8 (D. Mass. 2013) (Judge O'Toole granting summary judgment in favor of DOC Defendants because Plaintiff had not offered evidence that SBCC had a policy of double bunking prisoners with enemies and allowing them to fight, nor evidence that such a policy posed a risk of serious harm).

*(3) Inadequate medical care claim against Maynard*

Finally, Plaintiff asserts that Defendant Sally Maynard violated his Eighth Amendment rights by failing to provide him with adequate medical care. The "deliberate indifference" standard also applies to Eighth Amendment claims based on inadequate medical care. *See Perry v. Roy*, 782 F.3d 73, 78 (1st Cir. 2015). Just as with his failure to protect claims, Plaintiff must "satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285 (1976)).

There is insufficient evidence for a reasonable juror to conclude that Plaintiff satisfies either prong of the analysis. The video recordings show that at various times during the events of March 18-20, Plaintiff complained of gashes on his wrists, bruises and scrapes on his body, and asthma. However, medical personnel always examined Plaintiff, inquired of his medical needs, and concluded that he was fine. *See, e.g.*, SBCC DVD Disk 104, at 50:40-1:00:15. Plaintiff never asked to see a doctor or go to the hospital. He presents no evidence that any of his complaints worsened over time or caused long-lasting injuries. With one exception not relevant to the claims against Maynard,[10] Plaintiff did not appear to be in pain—let alone have a medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990).

---

[10] After being sprayed for the fourth time by Farley, Plaintiff fell to the ground and became unresponsive. *See* SBCC DVD Disk Restraint Checks 86-10, at 16:40-19:45. Nurse Colley examined him and washed out his eyes. 20:00-26:34. She remarked that "he's breathing okay so that makes me feel okay." *Id.* at 26:05. Correction officers then placed Plaintiff on a gurney, brought him back to K3-05, and carried him into the cell. *Id.* at 22:50-28:30. Nurse Maynard was not present at the time; she was not involved in Plaintiff's medical care after checking his wrist restraints around 1:00 am on March 20.

At best, a factfinder could conclude that Nurse Maynard and other medical personnel were impolite or dismissive in their dealings with Plaintiff. There is simply no evidence from which a reasonable juror could conclude that Maynard's medical care was so inadequate as to be "repugnant to the conscience of mankind" under the Eighth Amendment. *See Kosilek*, 774 F.3d at 82; *see also Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993) (noting that courts have "refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment"). Because there is no genuine issue of material fact regarding Plaintiff's inadequate medical care claim, the Court will grant summary judgment in favor of Nurse Maynard.

### Conclusion

For the foregoing reasons, the Court rules as follows:

(1) DOC Defendants' Motion for Summary Judgment (Docket No. 111) is ***granted in part*** and ***denied in part***. The motion is ***granted*** on claims against Defendants Dickhaut, Mendonsa, Fougere, Blood, LeBlanc, and Larochelle. All claims against those defendants are dismissed and they are terminated as parties from this case. The motion is ***denied*** on the excessive force claim against Defendant Farley.

(2) Nurse Sally Maynard's Motion for Summary Judgment (Docket No. 114) is ***granted***. All claims against Defendant Maynard are dismissed and she is terminated as a party in this case.


SO ORDERED.

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**